AMERICAN SCANTIC LINE, Inc., v. UNITED STATES.

District Court, S. D. New York.
Dec. 9, 1938.

272

Hatch & Wolfe, of New York City (Henry P. Elliott, of New York City, of counsel), for petitioner.

Lamar Hardy, U. S. Atty., of New York City (William E. Collins, of New York City, of counsel), for respondent.

HULBERT, District Judge.

This action at law was brought under the Tucker Act, 24 Stat. 505, to recover:

1. Three thousand dollars for expenditures in caring for shipwrecked seamen and covered by the first cause of action.

It is conceded by respondent that $1,582.64 is recoverable if the Court determines there is liability.

2. Two thousand nine hundred twenty-five dollars for repatriation of the shipwrecked seamen covered by the second, third and fourth causes of action.

It is conceded by respondent that the sum of $2,156 is recoverable if the Court determines there is liability.

3. One thousand six hundred twenty-five dollars for repatriation of shipwrecked seamen returned to United States ports upon vessels not owned or operated by petitioner, and covered by the fifth cause of action, abandoned on the trial.

The case was submitted on an agreed statement of facts and two exhibits and the issues presented are substantially the same as those determined in the case of American Scantic Line, Inc., v. United States, D.C., 5 F.Supp. 410, decided July 28th, 1933. In that case Judge Knox dismissed the first cause of action upon the ground that the expenditures sought to be recovered did not carry the consular validation which characterizes the repatriation charges, but sustained the right of recovery upon the second, third and fourth

causes of action at the rate fixed by the United States Consul,—the fifth cause of action in that case, as in this, having been abandoned upon the trial.

Proper judicial comity would require me to follow my colleague. Brusselback et al. v. Cago Corporation et al., D.C., 24 F.Supp. 524 at page 531.

But counsel for the Government insists that any recovery is barred by reason of the fact that the Congress inserted a special provision in the Appropriation Act of 1935, 48 Stat. 533, and that the intent of the Congress as thus expressed should govern this Court in the disposition of this action.

For the proper consideration and disposition of the contention of the Government's counsel, I make the following findings of fact:

1. The American Scantic Line, Inc., is a corporation duly organized and existing under and by virtue of the laws of the State of Delaware with an office for the transaction of business in the Borough of Manhattan, City of New York, at No. 5 Broadway, and was in 1929 the owner of the Steamship Conehatta, a steam vessel 390 feet in length, 54 feet beam, 32 feet depth, deadweight tonnage 7825, and which was a registered merchant vessel of the United States. The petitioner was also the owner of the Steamships Saguache, City of Fairbury and Bird City and other vessels, all of which were American merchant vessels, duly registered under the laws of the United States of America.

2. The Steamship Conehatta with a full complement of officers and crew, consisting of thirty-six men, while on a round trip voyage from New York to Swedish ports, stranded on or about November 7, 1929 in the vicinity of Storbaden Lighthouse in the Gulf of Bothnia and, as a result thereof, the vessel became a total loss and was abandoned by her officers and crew who were taken to Nordmaling, Sweden, arriving there on November 8, 1929. All personal effects of the crew were lost, due to the foundering of said vessel.

As to the first cause of action:

3. There was no American Consular Officer at Nordmaling and the Master of the Steamship Conehatta, as agent for the petitioner and petitioner's Stockholm representative, immediately communicated with the American Consul General at Stockholm, Sweden, and demanded of him

that he arrange for the necessary relief and repatriation of the crew back to the United States of America, at the expense of the respondent.

4. Upon the arrival of the officers and crew of the Steamship Conehatta at Nordmaling, Sweden, they were lodged in the Levar Hotel, Centralhotellet and Touristhotellet, where they received subsistence at the expense of the petitioner, the Consul General having received orders from his superiors in Washington not to make any payment. The Master of the Conehatta and other representatives of the petitioner purchased clothing and other necessaries for the destitute members of the crew at Nordmaling and then and thereafter expended money for medical attention, medicines and transportation, and other expenses in connection with the repatriation of certain members of the officers and crew, in addition to subsistence, of the fair and reasonable value of $1,582.-64. These expenditures were made by the petitioner without prejudice to its claim against the respondent. Thereafter claim for the above named expenditures incurred was submitted by petitioner, with supporting vouchers, to the Secretary of State, who in turn referred the same to the Comptroller General of the United States. Thereafter the Comptroller General rejected the claim to reimburse the petitioner and no payment has been made.

As to the second cause of action:

5. On or about the 13th day of November, 1929, the American Consul General at Stockholm, Sweden, requested the Master of the petitioner's vessel Saguache, under the penalty provided by law, to transport 16 of the destitute seamen who had been members of the crew of the Steamship Conehatta, from Husum, Sweden, to Baltimore, Maryland, via Copenhagen, together with the Captain of the Conehatta from Copenhagen to Baltimore, Maryland, making 17 persons in all, and the Consul General issued certificates, certifying that the regular charge for steerage passage, or the lowest rate on said vessel between Husum and Baltimore and between Copenhagen and Baltimore, was $125 per person. The distance of said voyage from Husum, Sweden, to Baltimore, Maryland, was 4600 statute miles.

6. That said 16 seamen were transported from Husum, Sweden, and discharged at Baltimore, and the Captain also was transported from Copenhagen and discharged at Baltimore, on the Steamship Saguache.

7. Thereafter, petitioner duly submitted its claim for the reimbursement for the transportation of the said 17 persons in the sum of $2,125, together with Consular certificates issued by the Consul General at Stockholm, Sweden, for such transportation to the Secretary of State, who in turn referred the same to the Comptroller General of the United States. Thereafter the Comptroller General rejected the said claim to reimburse the petitioner, and no payment has been made.

As to the third cause of action:

8. Thereafter, between the 16th and 23d days of November, 1929, the American Consul General at Stockholm, Sweden, requested the Master of the petitioner's vessel City of Fairbury, under the penalty provided by law, to take four of the destitute seamen, who were members of the crew of the Conehatta, on board his vessel at Husum, Sweden, and return them to Portland, Maine, or another port in the United States, via Copenhagen, and the Consul General issued certificates certifying that the regular charge for steerage passage or the lowest rate on said vessel between Husum and Portland, Maine, was $125 per person. The distance of said voyage from Husum, Sweden, to Portland, Maine, was 4600 statute miles.

9. That the said four destitute seamen were so transported on the said vessel City of Fairbury and were discharged at Portland, Maine.

10. Thereafter the petitioner duly submitted its claim for reimbursement for transportation of the four destitute seamen in the sum of $500, together with the Consular certificates issued by the Consul General at Stockholm, Sweden, for such transportation, to the Secretary of State, who in turn referred the same to the Comptroller General of the United States. Thereafter the said Comptroller General rejected the said claim to reimburse petitioner in said sum and no payment has been made.

As to the fourth cause of action:

11. On the 5th day of December, 1929, the American Vice-Consul at Malmo, Sweden, requested the Master of the petitioner's vessel Bird City, under the penalty provided by law to take two of the desti-

tute seamen, who were members of the crew of the Conehatta, on board his vessel at Copenhagen, and return them to Baltimore. Said Vice-Consul issued a certificate certifying that the regular charge for steerage passage or the lowest rate on said vessel between Copenhagen and Baltimore was $150 per person. The distance of said voyage from Copenhagen, Denmark, to Baltimore, Maryland, is 4600 statute miles.

12. The two destitute seamen were transported from Copenhagen on the Bird City and were discharged at Baltimore.

13. Thereafter, petitioner duly submitted its claim for reimbursement in the sum of $300, together with the certificate issued by the Vice-Consul at Malmo for such transportation, to the Secretary of State, who in turn referred the same to the Comptroller General of the United States. Thereafter the Comptroller General rejected said claim to reimburse said petitioner and no payment has been made.

The policy of the Government with respect to the return of destitute seamen to the United States is nearly as old as the Government itself. It was inaugurated in 1792, Act of April 14, Chap. 24, 1 Stat. 254, 256, and since 1803 the Government has undertaken to compensate for their transportation. Act of Feb. 28, 2 U.S. Stat., 204.

In 1896 the Congress extended the provision for such relief to American seamen shipwrecked in Alaskan waters (29 Stat. 186 of that year) and in 1929 it was further extended to include the Panama Canal Zone, Philippine Islands, Hawaiian Islands, Porto Rico and the Virgin Islands (45 Stat. 1098 of that year).

The first reported case in which that policy appears to have been questioned is Alaska Steamship Co. v. United States, D.C., 60 F.2d 135, affirmed, 9 Cir., 63 F.2d 398, and reversed in the United States Supreme Court, 290 U.S. 256, 54 S.Ct. 159, 78 L.Ed. 302, decided Dec. 4, 1933.

In that case the Deputy Collector of Customs of Ketchikan, Alaska, took full charge of 35 seamen, members of the crew of the Steamship Depere which had been wrecked at or near Port McArthur, Southeastern Alaska, on November 15, 1929. When his certificate requiring the master of the Steamship Yukon to transport these destitute seamen to Seattle for the sum of

$13.24 for each seaman was transmitted to the Treasury Department, payment was refused for the reason that: "The duty of relieving and transporting the crew of shipwrecked vessels is primarily that of the owner or operator and when this duty has been undertaken the appropriation for the 'Relief and Protection of American Seamen' is not available to reimburse the owner or operator for the expenses incurred in performing such duty."

In dismissing the complaint in the Alaska Steamship Company case, the District Court appears to have based its decision on the ground that the Act was "For the relief of destitute seamen, and not for the benefit of the steamship company." [60 F.2d 136.]

Included in the two exhibits received in evidence in the instant case is a letter from the American Consul General at Stockholm, dated November 11, 1929, from which the following is an excerpt:

"I have now received a telegram from the Department of State quoting for my guidance a decision of the Comptroller General of the United States under date of February 15, 1929, as follows:

" 'The liability of the United States for necessary relief and transportation shipwrecked seamen depends upon a condition of distress or destitution and no such condition can exist if owner or master of the vessel assumes or can be required to render the necessary relief and transportation.' "

The rulings made by the Comptroller of the Currency in the case of the Yukon and the Conehatta were almost simultaneous with the legislation enacted by the Congress to extend the provisions for the relief of shipwrecked American seamen to our insular possessions.

Mr. Justice Stone, speaking for the Supreme Court in the Alaska case, said [290 U.S. 256, 54 S.Ct. 161]:

"The rejection of petitioner's claim by the Comptroller General rests upon the supposed duty of the owner to transport to the home port the seamen of its own wrecked vessel. * * * we think it plain that no duty is imposed on the owner to provide transportation for seamen of his own wrecked vessel and that the statutory undertaking of the government is not upon condition that destitute seamen shall

be transported upon vessels other than those of the owner of the wrecked vessel.

\* \* \* \* \* \*

"The statutes terminate seamen's right to wages with the termination of their service by the shipwreck, and without qualification impose on the government the obligation to transport them. It cannot be supposed that the performance of this obligation which since the early days of the government has been treated by Congress as a public duty, was intended to be conditional upon the ability of seamen, left destitute in a distant land, to induce the shipowner to transport them in performance of a supposed duty which the statute neither imposes nor mentions.

\* \* \* \* \* \*

"The rulings of the Comptroller General rest upon a proposition so plainly contrary to law and so plainly in conflict with the statute as to leave them without weight as administrative constructions of it."

As further pointed out by him, the Appropriation Acts of 1922 and 1923 for the relief of American seamen contained the provision, not appearing in previous Acts, that no part of the appropriation should be available for payment of transportation in excess of a specified rate agreed upon by a consular officer and the master of the vessel. The proviso did not appear in subsequent Appropriation Acts, but by Act of January 3, 1923, it was transferred to its proper place in the Shipping Laws, and appears in Section 680 of Title 46, U.S.C.A. The Congress neither transferred the proviso contained in the Act of 1935 to the Shipping Laws, nor repeated it in the Appropriation Acts of 1936, 1937 and 1938.

The inclusion of that proviso in the Act of 1935 was thus contrary to a long established practice and the fact that it was not repeated or transferred to the Shipping Laws is a strong indication that the Congress did not choose to adhere to it.

By the Act of May 7, 1930, Chap. 227, 46 Stat. 261, Section 680 of Title 46, U.S.C.A., was combined with Section 679 and Section 681 was repealed. Section 679 so far as material now provides as follows: "All masters of vessels of the United States and bound to some port of the same, are required to take such destitute seamen on board their vessels, at the request of consular officers, and to transport them to the port in the United States to which such vessel may be bound \* \* \* and the amount agreed upon between the consular officer and the master of the vessel in each individual case not in excess of the lowest passenger rate of such vessel and not in excess of 2 cents per mile shall in each case constitute the lawful rate for transportation on steam vessels; and said consular officer shall issue certificates for such transportation, which certificates shall be assignable for collection. \* \* \*"

In Heil v. United States, D.C., 273 F. 729, 731, Learned Hand, then District Judge, now Circuit Judge, said: "Whatever be the justification in policy of the sovereign's immunity, the first consideration ought to be this: That in the performance of its voluntary engagements with its citizens it should conform to the same standard of honorable conduct as it exacts of them touching their conduct with each other. Any policy which would exempt the United States from the scrupulous performance of its obligations is base and mean; it serves in the end to bring the United States into contempt, to prejudice it in its dealings when it enters into the common field of human intercourse, and to arouse the indignation of honorable men. Congress by the Tucker Act meant to avoid such consequences."

It is my opinion that the proviso in the Appropriation Act of 1935 does not restrict me in following the course pursued by Judge Knox, and I therefore make the following conclusions of law:

1. The first cause of action is dismissed.

2. Upon the second cause of action petitioner is entitled to recover the sum of $1,552.

3. Upon the third cause of action petitioner is entitled to recover the sum of $368.

4. Upon the fourth cause of action petitioner is entitled to recover the sum of $224, making a total of $2,144.

The fifth cause of action is deemed to have been abandoned.

Petitioner will have judgment accordingly, with costs and disbursements of this action.